

7003 2260 0006 9683 7041



**Ball & Scott Law Office**
550 West Main Avenue, Suite 601
Knoxville, TN 37902

Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362



Santa Clarita P&DC 913
SAT 07 NOV 2009 AM

Exhibit·A·

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X ☐ Agent ☐ Addressee<br>B. Received by ( Printed Name ) C. Date of Delivery |
| 1. Article Addressed to:<br><br>Guitar Center Inc.<br>5795 Lindero Canyon Rd<br>Westlake Village, CA<br>91362 | D. Is delivery address different from Item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>3. Service Type<br>☒ Certified Mail ☐ Express Mail<br>☐ Registered ☐ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee) ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7003 2260 0006 9683 7041 |

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

| Knox County | **CIVIL SUMMONS**<br>page 1 of 1 | Case Number |
|---|---|---|
| | | 1262391 |

| Donnie Collins et al., | Vs. | Guitar Center, Inc. and National Association of Music Merchants, Inc. et al., |
|---|---|---|

Served On:

**Guitar Center, Inc.**  5795 Lindero Canyon Road Westlake Village, California

You are hereby summoned to defend a civil action filed against you in _Chancery_ Court, _Knox_ County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default can be rendered against you for the relief sought in the complaint.

Issued: _10/13/09_

_Howard G. Hogan_
Clerk / Deputy Clerk

Attorney for Plaintiff: _Gordon Ball, 550 West Main Street, Suite 601_
_Knoxville, TN 37902_

## NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a four thousand dollar ($4,000) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

## CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

_____
Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within thirty days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

_____

Date: _____

By: _____
Officer, Title

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____
Notary Public / Deputy Clerk (Comm. Expires _____ )

_____
Signature of Plaintiff

_____
Plaintiff's Attorney (or Person Authorized to Serve Process)
**(Attach return receipt on back)**

*ADA: If you need assistance or accommodations, please call _____, ADA Coordinator, at ( ) _____*



DONNIE COLLINS,                              )
on behalf of himself and all others         )
similarly situated                          )
            Plaintiff,  )          NO.
v.                                           )          _1 76 237-1_
                 )          **CLASS ACTION**
GUITAR CENTER, INC.; and NATIONAL            )
ASSOCIATION OF MUSIC MERCHANTS, INC;         )          **JURY TRIAL**
                 )          **DEMANDED**
                 )
            Defendants.  )

---

## CLASS ACTION COMPLAINT

NOW INTO COURT comes the Plaintiff, Donnie Collins ("Plaintiff"), by the undersigned attorneys, individually and on behalf of all others similarly situated and brings this action for damages and/or restitution pursuant to Tennessee law.

### I.    NATURE OF ACTION

1.    Plaintiff, a consumer and a purchaser of an electric guitar from Defendant, Guitar Center, Inc., brings this action on his own behalf and on behalf of a class of persons who purchased in Tennessee fretted musical instrument products such as acoustic and electric guitars, violins, amplifiers and string ("Fretted Instrument Products") between January 1, 2005 and December 31, 2007.[1]

2.    Plaintiff seeks damages from these defendants under the Tennessee Trade Practices Act, Tenn. Code Ann. §47-25-101, *et seq.* (the "TTPA"), which prohibits arrangements, contracts, agreements, trusts, combinations and conspiracies which lessen or tend to lessen competition.

---

[1] Lawsuits have been filed in other jurisdictions seeking certification of a nationwide class of purchasers of Fretted Instrument Products.

3. Plaintiff also seeks restitution for any benefit unjustly conferred on Defendants.

4. As set forth below, Plaintiff alleges that Defendant Guitar Center, Inc ("Guitar Center") conspired with Defendants, National Association of Music Merchants, Inc. ("NAMM") as well as other unnamed co-conspirators, to maintain, implement and enforce illegal pricing policies. These policies had the purpose and effect of fixing prices, and restricting and/or eliminating price competition (specifically price discounting), all in violation of the TTPA.

5. Specifically, during 2005 and 2007, NAMM organized meetings and programs where Fretted Instrument Product retailers discussed and entered into agreements regarding (1) restricting retail price competition, (2) adopting, implementing, and enforcing minimum advertised price policies, and (3) retail prices and margins.

6. The effect of these agreements was the creation of unlawful resale price maintenance agreements by and among NAMM members, which had been orchestrated and facilitated by NAMM.

7. The unlawful nature and scope of this activity has been the subject of inquiry and action by the United States government.

8. In March 2009, the Federal Trade Commission ("FTC") issued a cease and desist order to NAMM and at the same time settled the FTC's charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act among its members and that the acts and practices of NAMM "constitute unfair methods of competition in or affecting commerce in violation of Section 5 of the Federal Trade

Commission Act, as amended 15 U.S.C. § 45." The FTC also alleged that absent appropriate relief "such acts and practices, or the effects thereof will continue or recur..."

9. Specifically, the FTC, after an investigation, alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as defendants herein, at which competing retailers of musical instruments were permitted and encouraged to exchange competitively sensitive information, strategies for implementing minimum advertised pricing and restrictions of retail price competition.

10. The FTC concluded that the "challenged conduct served no legitimate business purpose and resulted in no significant efficiency benefits."

11. According to the FTC's press release announcing NAMM's settlement of "FTC Charges of illegally Restraining Competitions" "the FTC's proposed consent order is designed to remedy NAMM's anticompetitive conduct." The Commission's vote to accept the complaint and the consent order was 4-0. In the competition-restrained market created by defendants' conduct, Plaintiff and the Class purchased Fretted Instrument Products in Tennessee at artificially inflated prices.

12. Absent defendants' unlawful conduct, Plaintiff and the other Class members would have paid lower prices for the Fretted Instrument Products they purchased in Tennessee during the Class Period.

## II. PARTIES

13. Plaintiff and putative Class Representative Donnie Collins ("Plaintiff") resides at 550 Drowning Creek Ridge, Irvine, KY 40336. Plaintiff purchased a Fretted Instrument Product, specifically an electric guitar, from Defendant Guitar Center Inc.'s retail location in Knoxville, Tennessee during the Class Period.

14.     Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008. NAMM is a trade association comprised of more than 9,000 members, including Guitar Center, Inc., that include manufacturers, distributors, and dealers of musical instruments and related products. Most United States manufacturers, distributors, and dealers of musical instruments are members of NAMM. NAMM is controlled by its members.

15.     Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California and is a retail seller of Fretted Instrument Products. Guitar Center is a member of NAMM.

16.     Guitar Center owns and operates a retail store at 8917 Town and Country Circle, in Knox County, Tennessee.

17.     Whenever this Complaint makes reference to any act, deed, or transaction of any business organization, the allegation means that the organization engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

## III.     CO-CONSPIRATORS

18.     Various other individuals, firms and corporations, not named as defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.   Plaintiff reserves the right to subsequently name some or all of these persons as defendants.

## IV.   JURISDICTION AND VENUE

19.     This class action is brought exclusively under Tennessee law. Plaintiff asserts no claim under the laws of the United States.  The amount in controversy as to Plaintiff and each individual member of the Proposed Class does not exceed Seventy-Four Thousand Nine Hundred Ninety-Nine Dollars ($74,999.00) each, exclusive of interest and costs; and Plaintiff disclaims compensatory damages, punitive damages, declaratory, injunctive, equitable or other relief greater than Seventy-Four Thousand Nine Hundred Ninety-Nine Dollars ($74,999.00) per individual Class member.  Further, Plaintiff and members of the Proposed Class limit their aggregate class-wide claims for relief to less than Four Million Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine Dollars ($4,999,999.00) and specifically disclaim compensatory damages, punitive damages, disgorgement, declaratory, injunctive, equitable or other relief greater than Four Million Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine Dollars ($4,999,999.00).

20.     Venue is proper in Knox County pursuant to Tenn.  Code Ann.  §20-4-101, which provides that venue lies in the county where Plaintiff's claim arose.    A substantial part of the harm to Plaintiff arose in Knox County, Tennessee.    Specifically, purchased a Fretted Instrument Product in Knox County during the Class Period.

21.     Further, Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) have:

     (a)     transacted business in Tennessee and Knox County;

     (b)     intentionally availed itself of the benefits of doing business in Tennessee and in Knox County;

(c)     promoted, imported, sold, marketed, and/or distributed Fretted Instrument Products in Tennessee and in Knox County and purposefully profited from access to the markets of Tennessee and Knox County;

(d)     caused tortious damage by act or omission in Tennessee and in Knox County;

(e)     committed acts and omissions that Defendant knew or should have known would cause damage in Tennessee and in Knox County to the Plaintiff and the Proposed Class while:

         (i)     regularly doing or soliciting business within Tennessee and in Knox County, engaging in other persistent courses of conduct within Tennessee and in Knox County; and/or

         (ii)     deriving substantial revenue from goods used or consumed or services rendered in Tennessee and in Knox County;

(f)     otherwise had the requisite minimum contacts with Tennessee and Knox County such that, under the circumstances, it is fair and reasonable to require Defendant to come to this Court to defend this action.

## V. CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on his own behalf and on behalf of a class of persons pursuant to Tenn. R. Civ. P. 23. The Class is defined as follows:

> All persons who purchased one or more Fretted Instrument Products at a physical store locations in Tennessee during the Class Period. Excluded from the class are all persons whose purchase of Fretted Instrument Products was limited to mail order or internet. Also excluded are all employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies of Defendants.

The period of time from January 1, 2005 through December 31, 2007 may be referred to herein as the "Class Period".

23.     The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise

number of such persons is unknown, Plaintiff believes that there are many thousands of Class members.

24. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a) Whether Defendants and their co-conspirators engaged in an agreement, combination, and/or conspiracy among themselves to fix, raise, maintain or stabilize the prices of Fretted Instrument Products sold in Tennessee;

(b) The identity of the participants of the alleged agreement, combination, and/or conspiracy;

(c) The duration of the alleged agreement, combination, and/or conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the agreement, combination, and/or conspiracy;

(d) Whether the alleged agreement, combination, and/or conspiracy violated the Tennessee Trade Practices Act;

(e) Whether Defendants unjustly enriched themselves to the detriment of the Class, thereby entitling Plaintiff and other Class members to disgorgement of all benefits derived therefrom;

(f) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused damage the Plaintiff and the other members of the Class;

(g) The effect of the alleged agreement, combination, and/or conspiracy on the prices Fretted Instrument Products sold in Tennessee, during the Class Period;

(h)    Whether the Defendants and their co-conspirators fraudulently concealed the existence of the agreement, combination, and/or conspiracy from the Plaintiff and the other members of the Class; and

(i)    The appropriate Class-wide measure of damages.

25.    Plaintiff's claims are typical of the Class' claim, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

26.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained class counsel who is competent and experienced in the prosecution of class action litigation.

27.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    The Class is readily definable.    Prosecution as a class action will eliminate the possibility of repetitious litigation.    Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of class members to pursue their claims.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.    This class action presents no difficulties in management that would preclude maintenance as a class action under Tenn. R. Civ. P.  23.02.

## VI. FRAUDULENT CONCEALMENT

28.     Plaintiff and members of the Class did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracies alleged herein until the FTC issued a press release in March 2009.

29.     Because Defendant's agreements, understandings, and conspiracies were kept secret, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that Plaintiff and the Class members had been wrongfully deprived of the opportunity to purchase Fretted Instrument Products at competitive prices.

30.     None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the wrongful conduct of the Defendant alleged herein prior to March 2009.

31.     As a result of Defendant's fraudulent concealment of its conduct, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

## VII. FACTUAL ALLEGATIONS

### A. The Fretted Instrument Products Market

32.     "Music product" companies are generally understood to include companies which manufacture, supply or sell at retail musical instruments, accessories and products for amplifying and recording music.

33.     According to The Music Trades, there are distinct product categories within the music product markets, including the fretted instrument product category,

(consisting of acoustic and electric guitars, instrument amplifiers and strings), and pianos, consisting of acoustic and digital pianos, percussion products consisting of drums, cymbals and mallets. Within the Fretted Instrument Product market, guitars are by far the most popular music instruments.

34.     According to data maintained by The Music Trades — the only industry trade publication - in the past six years, the ten largest music product suppliers have increased their market share from approximately 42% to 2002 to *50%* in 2008.

35.     The guitar and accessories product market is recognized as a distinct product market in the industry and has its own trade association, the Guitar and Accessories Marketing Association ("GAMA").

36.     Published figures from NAMM and The Music Trades reports that from 1998 to 2007 acoustic guitar sales grew to 1.35 million units from 611,000. Sales of electric guitars grew from 543,000 to 1.5 million units during the same period.

37.     In 2008, the Fretted Instruments Product category retail dollar sales volume was $1.55 billion. The entire music instrument market was approximately $7 billion dollar per year.

38.     According to a Music Trades report published in 2008, the music industry had gross margin of 30% versus approximately 22% gross margins for consumer electronics.

39.     Despite the growth in sales volume and increased gross margins, the industry has been consolidating rather than attracting new entrants. In 2008, according to Musical Merchandise Review issue of July 2009, 171 outlets selling fretted instruments closed.

40.    New entrants to the retail market must make large investments in inventory and retail selling space, and this requirement serves a significant barrier to meaningful entry into the music product retail market. As one NAMM member observed (as reported in the March 1, 2008 issue of The Music Trades): "To generate reasonable sales volume, you need a lot of SKUs. I am not sure they [Best Buy, then attempting to enter the music retailing market] will be able to achieve the kind of volume they're hoping for in just 2500 square feet of space." In a published report in 2008, Morningstar's retail analyst, Brady Lemos, stated the retailing music business was taking "up a lot of real estate."

41.    Consumers strongly prefer purchasing music products, in particular Fretted Instrument Products, at retail locations specializing in music product.[2] As a result, market competition is generally localized.

42.    The State of Tennessee constitutes a distinct market for the sale of Fretted Instrument Products.

## B. Guitar Center's Dominance and Power in the Industry

43.    During the past decade, Guitar Center has grown through acquisitions. In June 1999, Guitar Center bought "Musicians Friend" a leading catalogue and instrument retailer with nine retail stores. In April 2001, Guitar Center acquired American Music Group and its 12 retail stores, two mail-order catalogues and music accessory distributor. In mid 2005, Guitar Center bought Music & Arts Center and its 80 locations. In 2006, Guitar Center acquired four Hermes Music stores in Texas. In February 2007, Guitar Center acquired the Woodwind and The Brasswind out of bankruptcy. Guitar Center

---

[2] See, NAMM-commissioned Gallop poll referenced at ¶¶ 48-49 below.

acquired other retailers as well during the decade. As of the end of 2008, Guitar Center's annual sales of $1.55 billion were to the musical instruments annual sales of $7 billion.

44.     Guitar Center is the only national chain of music retailers and is viewed as dominant in the retail market with *295* stores and the industry's largest mail order operation and sales of $2.0 billion. Guitar Center grew to nearly *5* times the size of its nearest competitor by 2007 according to Music Trades. From 1997 to 2007, its market share has grown from 6.1% to 26.6%.

45.     Guitar Center dwarfs it next largest competitor. Sam Ash Music Corporation is the number two musical instrument retailer in the United States and operates 45 stores in California, New York and Texas and nine other states. In 2002, Sam Ash acquired the top nine stores of the Mars Music Chain.

46.     Guitar Center is, according to its own publicly filed financial reports in 2007, the largest customer of many of its suppliers and thus each manufacturer depends on Guitar Center for substantial portion of its sales of Fretted Instrument Products, as well as its profits.

### C. Retailers are Threatened by the Internet

47.     While internet purchasing or "e-commerce" is still a relatively new form of buying products, it poses a significant and serious threat to traditional "brick and mortar" stores. The market for Fretted Instrument Products is no exception.

48.     According to a national Gallop poll commissioned by NAMM (and conducted regularly since 1978) while specialized music retail stores, such as those operated by Guitar Center, remain the consumer's first choice for buying music products, e-commerce is now a larger competitor than mass market retailers. *57%* of poll

respondents preferred to purchase at specialized music stores versus 23% who expressed a preference for internet purchases.

49.     In the Gallop poll, only 15% expressing a preference for mass market retailers.  Moreover, the mass market retailers' stock mainly lower-end guitars in the $250 or less range, and as described above mass market retailers do not carry as large of a product selection as specialized music stores.

50.     Internet retailers of Fretted Instrument Products are highly efficient competitors because, among other reasons, their operating expenses are low.  Thus, the internet retailers compete vigorously on price, both with other internet retailers and with retailers in other trade channels. When allowed to compete freely, internet retailers' price competition enhances consumer welfare by bringing down prices.

51.     Internet retailers thus posed a serious risk to the NAMM and its members, especially specialized music stores, including Guitar Center.

52.     NAMM reacted aggressively and illegally to this significant threat to its members' pricing freedom and profitability.

## D. NAMM Combats Discounting and Controls Prices on Behalf of Its Members

53.     Most U.S. manufacturers, distributors, and dealers of musical instructions are members of NAMM.  As the FTC observed in its March 4, 2009 press release entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition,* "NAMM serves the economic interests of its members by, among other things, promoting consumer demand for musical instructions, lobbying the government, offering seminars, and organizing trade shows.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet

with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry." *See,* http://www.ftc.gov/opa/2009/03/namm.shtm

54.     Between 2005 and 2007, NAMM organized various meetings and programs for its members at which competing retailers of musical instrument were permitted and encouraged to exchange information and discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices.

55.     At the time, NAMM shows were considered an indispensable resource by music product retailers. In a February 2007 interview a member was quoted in Musical Merchandise Review:

>     Many years ago, the importance of attending a NAMM
>     show may not have seemed important, today it is absolutely
>     necessary. Owners and key personnel should be at
>     NAMM…the education seminars are priceless. The
>     interaction with the industry people and colleagues is also
>     priceless.

56.     Representatives of NAMM determined the scope of information exchange and discussion by selecting moderator and setting the agenda for these programs.

57.     At these NAMM-sponsored events, NAMM members including manufacturers and retailers discussed and illegally agreed upon the adoption, implementation, and enforcement of minimum advertised price policies ("MAP policies"); and illegally agreed upon the details of such policies, including optimal retail price and margins.

58.     Further, NAMM members, including manufacturers and retailers, discussed and illegally agreed upon strategies and policies for raising or at least

maintaining retail prices ("resale price maintenance" polices or "RPM" polices) and illegally agreed on prices, margins, minimum advertised price policies and their enforcement.

59.     The conduct of the defendants was the cause of supra competitive price levels for products in the Fretted Instrument Product market. Music Merchandise Review, issue date October 2008, reported that Anthem Music Group's head D. Kilkenny observed "over the past several years instrument prices seem to be increasing at a greater rate than that of inflation ..." According to The Music Trades "Annual Census of The Music Industries" in 2006, the average price of guitar was $309 by 2007 the average price was $350 and by 2008 the average price was $372.

60.     No significant pro-competitive benefit was derived from the challenged conduct. After analyzing the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions, the FTC concluded that the exchange of information engineered by NAMM lacked a pro-competitive justification.

61.     The FTC ordered NAMM to cease and desist from:

(a) Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

(i) the retail price of any Musical Product;

(ii) any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or

pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

(iii) the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

(b) urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

(i) the retail price of Musical Products; or

(ii) any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

### E. The Important Role of Guitar Center in the Adoption Of Resale Price Maintenance Policies

62.    Guitar Center played an important role in the adoption, implementation and enforcement of MAP and RPM policies.

63.    The MAP and RPM policies were not adopted, implemented and enforced by Fretted Instrument Products manufacturers for legitimate reasons, such as to promote and/or maintain high levels of customer service. Rather, the MAP and RPM policies were simply to protect the margin of retailers, namely Guitar Center.

64.    Guitar Center actively encouraged MAP and RPM polices, and in some instances Guitar Center threatened not to continue buying Fretted Instrument Products manufacturers' products, unless MAP and/or RPM policies were adopted, implemented and enforced.

65.     According to independent retailers, Guitar Center wields enormous power in the industry.  In an interview in Musical Merchandise Review, April 2007 issue, Alan Levin of Chuck Levin's Washington Music Center said:

> The biggest concern is Guitar Center.  They are many
> manufacturers' biggest customers and changes are being made...
> to suit them alone.

66.     One NAMM member observed (as reported in the March 1, 2008 issue of Music Trades) "Guitar Center has too much leverage".

67.     The fact that a retailer such as Guitar Center was aggressively pushing the MAP and RPM policies substantiates the FTC's conclusion that there was no significant pro-competitive benefit to these polices.

### F.  Effects of Defendants' Unlawful Conduct

68.     The policies inflicted on music retailers by NAMM and manufacturers and agreed to by retailers restricted price competition in Tennessee, and were fundamentally anticompetitive and contrary to Tennessee's antitrust law.  According to a Wall Street Journal Report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc. said "it [his company] had very little choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

69.     Defendants' practices have had the following anticompetitive effects, among others, in Tennessee:

(a) Competition was been unreasonably restrained, suppressed, and, in some cases, destroyed;

(b) Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against NAMM and its members;

(c) Purchasers of musical instruments have been denied the benefits of competition in a free and open market and have been forced to pay artificially high instrument prices;

(d) Guitar Center and NAMM and its members have enjoyed, and will continue to enjoy, ultra competitive profits to the detriment of purchasers of musical instruments.

70.     The aforementioned anticompetitive effects of Defendants' conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

71.     A small but significant non transitory price increase in fretted instrument product category would not result in a loss of sales within this product market to sales in other music product categories.

## VIII.   CLAIMS FOR RELIEF

## COUNT I

### Violation of Tennessee Trade Practices Act

72.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this complaint.

73.     From at least January 1, 2005 through at least December 31, 2007, Defendants and their co-conspirators engaged in a multitude of continuing contracts, combinations or conspiracies with respect to the sale of Fretted Instrument Products in unreasonable restraint of trade and commerce in Tennessee and in violation of the

Tennessee Trade Practices Act, Tennessee Code Annotated ("T.C.A.") §47-25-101, *et seq.*, as set forth herein.

74.     The contracts, combinations or conspiracies consisted of agreements among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially supra-competitive prices for Fretted Instrument Products.

75.     In formulating and effectuating these contracts, combinations and conspiracies, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)     participating in meetings and conversations among themselves during which they agreed to impose restrictions on advertised prices and resale prices of Fretted Instrument Products, and otherwise to fix, increase, maintain or stabilize effective prices paid by Plaintiffs and members of the Class with respect to Fretted Instrument Products;

(b)     participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

76.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase or stabilize prices for Fretted Instrument Products.

77.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the TTPA, which permits any person injured, such as the Plaintiffs and other Class members, to seek redress for their injuries arising out of illegal agreements, combinations, trusts, or conspiracies.

78.     During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce and caused injury to consumers in Tennessee.

79.     Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' unlawful combinations, contracts, and conspiracies. Plaintiffs and Class members have paid more for Fretted Instrument Products than they otherwise would have paid for them in the absence of Defendants' conduct. This injury is of the type the TTPA was designed to prevent and flows from that which makes Defendants' conduct unlawful. Accordingly, Plaintiffs and Class members seek damages and costs of suit, including reasonable attorneys fees, to the extent permitted.

80.     Defendants' contracts, combinations and conspiracies to fix, raise, maintain, or stabilize the prices of Fretted Instrument Products had the following substantial effects on Tennessee commerce:

(a)     The prices of Fretted Instrument Products purchased in Tennessee were fixed, raised, maintained, or stabilized at inflated, artificial and non-competitive levels;

(b)     Buyers of Fretted Instrument Products in Tennessee were deprived of free and open competition;

(c)     Competition was restrained in Tennessee; and

(d)     Buyers in Tennessee paid higher prices for Fretted Instrument Products than they would have paid had they been able to purchase Fretted Instrument Products absent Defendants' conspiracy.

81.     By reason of Defendants' violations of the TTPA, Plaintiffs and the Class Members paid significantly more for Fretted Instrument Products than they would have

paid in the absence of Defendants' illegal contracts, combinations and conspiracies and, as a result, Plaintiffs and other Class members have suffered damages in amounts presently undetermined.

82.     Defendants' conspiracies further substantially affected Tennessee commerce because Defendants, either directly or through their agents and/or members, engaged in the following activities in or affecting Tennessee:

(a)     Transacted business in Tennessee;

(b)     Contracted to supply or obtain goods or revenue related to the marketing or sale of Fretted Instrument Products in Tennessee;

(c)     Intentionally availed themselves of the benefits of conducting business in Tennessee;

(d)     Produced, promoted, sold, marketed, and/or distributed Fretted Instrument Products in Tennessee, thereby purposefully profiting from access to Tennessee's market;

(e)     Committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee, while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used or consumed in Tennessee.

83.     Defendants' conspiracies substantially affected Tennessee commerce in the following additional ways:

(a)     Substantial Effects on Tennesseans' Trade or Commerce: Defendants' conduct was far-reaching and substantially affected Tennessee. Fretted Instrument Products were purchased by no less than thousands of persons in Tennessee, in all segments of society.

(b)     The Substantial Monetary Effect on Tennessee Trade or Commerce: Defendants' conduct lasted several years and over that time Defendants sold a

substantial amount of Fretted Instrument Products in Tennessee.

(c) The <u>Substantially Harmful Effect on the Integrity of the Tennessee Market</u>: The Tennessee market is vulnerable and can be manipulated by conspirators either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, companies that break the law will remain unpunished, and they will remain able to prey upon Tennesseans without consequence. The purpose of Tennessee's antitrust laws is to protect the state's trade and commerce affected by anti-competitive conduct. Defendants have shattered this very purpose by illegally and criminally victimizing the market. Thus, every level of the market's integrity has been compromised, from the manufacturer to the middlemen to the consumer.

(d) <u>Length of Substantial Effect on Tennessee Commerce</u>. Some agreements, combinations, or conspiracies are short-lived. These lasted for several years, providing Defendants with illegal profits and permitting Defendants' to continue their victimization of consumers and substantially affect Tennessee commerce.

## COUNT II

### Unjust Enrichment

84.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this complaint.

85.     Defendants and NAMM members have benefited from its unlawful acts through the overpayments for by Plaintiff and the other Class members and the increased profits resulting from such overpayments.   It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by Defendants.

86.     By reason of its unlawful conduct, Defendants should make restitution to Plaintiff and the Class.    To the extent Plaintiff is required to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because: (a) the issues are of the type that would be appropriate for judicial determination, and (b) applying the doctrine here would result in substantial financial hardship, inequity and economic inefficiency and would violate public policy.   Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

87.     In equity, Defendants should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and Class members.

## IX.  JURY TRIAL DEMANDED.

88.     Plaintiff demands a jury trial on issues so triable.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

1.     That the summons be issued and that Defendants be duly served with a copy of this Complaint and required to answer same, and that this Court decree and enter judgment.

2.     That the Court certify the Class as proposed and appoint the Plaintiff as representative of the Class;

3.     That the Court award compensatory damages to Plaintiffs and the Class resulting from the various acts of wrongdoing under the statutory laws of the State of

Tennessee, in such amounts as represent the losses reasonably suffered by Plaintiffs and the Class.

4.     That the Court decree that Defendants have violated the Tennessee Trade Practices Act, T.C.A. §47-25-101 et seq. and award Plaintiffs and the Class appropriate relief, including full consideration under §47-25-106 of the Tennessee Trade Practices Act.

5.     That the Court decree that Defendants have been unjustly enriched by their wrongful conduct, and award restitution to Plaintiff and the Class.

6.     That the Court award Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity.

7.     That the Court order such other, further and general relief as is just and proper.

Respectfully submitted this 13th day of October, 2009.

Gordon Ball, Esq.
W. Allen McDonald
BALL & SCOTT LAW OFFICES
Suite 601, Bank of America Center
550 Main Street
Knoxville, TN  37902
(865) 525-7028

## COST BOND

We, the undersigned principal and surety, hereby bind ourselves to secure the costs of this action.

Principal:    Donnie Collins

By:    Gordon Ball
    Ball and Scott Law Offices

Surety:    Gordon Ball
    Ball and Scott Law Offices